Donald W. McLean, Appellant *v.* Unemployment Compensation Board of Review of the Commonwealth of Pennsylvania, Appellee.

· Argued May 7, 1976, before Judges CRUMLISH, JR., WILKINSON, JR., and BLATT, sitting as a panel of three.

*Shari F. Shink,* for appellant.

*Charles G. Hasson,* Assistant Attorney General, with him *Sydney Reuben,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

OPINION BY JUDGE CRUMLISH, JR., September 14, 1976:

Donald W. McLean (Claimant) appeals to this Court from an order of the Unemployment Compensation Board of Review (Board) which affirmed a referee's decision modifying the Bureau of Employment Security's determination. The Board's denial was based on a conclusion that Claimant was properly discharged because of wilful misconduct. The Board therefore approved the referee's findings of fact and conclusions of law that Claimant was ineligible pursuant to Section 402(e) instead of Section 401(b)(1).[1]

Claimant contends that the Board erred in its conclusion that Perlite Manufacturing Company (Employ-

---

[1] Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §751 et seq.

er) did in fact meet its burden in establishing that the actions of Claimant constituted wilful misconduct.

He argues that the action of Employer ordering him to drive a truck in disrepair was unreasonable. We would agree with Claimant, if the facts were as he believed them to be. However, Claimant was discharged because he refused to drive the truck if it was repaired by CNS Service Company. In effect, he was informing Employer to comply with his wishes. Phrased differently, he was substituting his judgment for that of his employer.

The Board, in affirming the referee, found, *inter alia*:

"2. On March 19, 1975, claimant complained to the employer that the truck he had operated that day was not operating properly.

"3. The employer advised the claimant he would take the truck to a garage for repairs.

"4. Claimant informed the employer that if the truck was taken back to the same garage where it had previously been worked on, he would not drive the truck.

"5. Claimant was discharged because he refused to perform the duties of the job with the employer's equipment that was available to him."

After a careful review of the testimony in this case, we hold that these findings of the Board are supported by the evidence. Further, we note that an employe's direct refusal to perform an assigned duty given by the employer meets the legal test of wilful misconduct. *Unemployment Compensation Board of Review v. Homsher*, 21 Pa. Commonwealth Ct. 576, 347 A.2d 340 (1975).

Accordingly, we

ORDER

AND Now, this 14th day of September, 1976, the decision and order of the Unemployment Compensation Board of Review is affirmed.

DISSENTING OPINION BY JUDGE BLATT:

I must respectfully dissent. I do not believe that the claimant's behavior in this case amounted to willful misconduct.

In the first place, it must be kept in mind that the employer has the burden of proving that the claimant's conduct has arisen to the level where Section 402(e) of the Unemployment Compensation Law[1] (Act), 43 P.S. §802(e), requires that he must be disqualified from receiving benefits because of willful misconduct. In addition, a finding of willful misconduct must be supported by substantial evidence. The employer, in this case, the Perlite Manufacturing Company, did not even appear at either of the two hearings held at the direction of the Unemployment Compensation Board of Review (Board), and it was upon the claimant's own testimony that the Board concluded that the claimant was disqualified for willful misconduct.

The claimant's own testimony, moreover, which we will quote below, is well worth reviewing. It shows some justification for his alleged willful misconduct, and it was not rebutted. And, while he admits refusing to obey a directive of his employer, which in normal circumstances would amount to willful misconduct, our Supreme Court has admonished us that "where the action of the employee is justifiable or reasonable under the circumstances it cannot be considered wilful misconduct. . . ." *Frumento v. Unemployment Compensation Board of Review,* Pa. , , 351 A.2d 631, 634 (1976). The claimant related the entire incident at the second hearing[2] substantially as follows:

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §751 et seq.

[2] This hearing was ordered by the Board specifically to provide the employer, Perlite Manufacturing Co., an opportunity to appear

REFEREE TO CLAIMANT:

"Q. Well, why don't you, Mr. McLean, just act as though I know nothing about this case, take it from the beginning, and we'll give you every chance to testify at this hearing. Won't you tell us what happened, if you can, please? You may refer to notes, or whatever you wish.

"A. ... I was called by Perlite Manufacturing Co. on a Sunday afternoon. They were in dire need of a truck and a driver and at the present time I'm a truck driver and I drive a owner-operator truck for Larry E. Young. ... They called and asked me if I would come in and go to work for them and bring my truck in to drive it for them—that they needed help.... At this time Mr. Bosley [of Perlite] also stated that he had an old truck there, but they seem to have trouble with the truck and they could not keep a driver on it. And he gave me the reasons: the truck was unsafe and every driver had refused to drive the truck. He asked me if I would go over the truck and make a list of faults on the truck and submit them to him, because it was possible they were going to try to have the truck repaired and use their own truck in the future—and just use the truck which I leased them through Mr. Young temporarily.

. . . .

"Q. All right. Continue, please.

"A. ... So I made up a complete list of what was wrong with the truck. Mr. Bosley stated to me then that the truck had been in the garage just prior to my coming down there and he felt that the garage had done a lot of work on it but it appeared that they did not bring the truck up to a truck-driver's standards, which of course is a federal law for me. ... So he said that he would take it back to this garage and have

---

and present evidence. No representatives of the employer, however, appeared at the hearing.

more work done on it. I said to him, 'At this time, Mr. Bosley, I feel that that is a waste of time, because of the fact that you've already been charged for this work on this truck and it hasn't been done.' And I showed him right on the vehicle where it had not been done. He said that well, he was going to take it back up to them anyway and have them go over everything that I put on the list. . . . So Mr. Bosley three days later said to me, 'Well, would you go up and pick up the truck and drive it back down here and we'll see how it is.' So I went up to the—I forget the name of the garage, it's in Bethel, Pa.—I picked up the tractor to bob-tail [drive without a trailer] it back to Perlite Mfg. Co.—

. . . .

"Q. Okay.

"A. And before pulling out of the garage up there, I went over a few items which was on the list which was to be checked and repaired. They had not been done. The brake-plates had not been pulled off to give me a reading on the brakes. I asked for a reading—what percentage of brakes. 'Don't worry about it . . . they're good for 3 months . . . they're good for 6 months.' I said, 'I did not ask you that.'

. . . .

"Q. It's your testimony that the truck had not been greased?

"A. Yes, sir. It had not been greased, the backing plates for the brakes had not been pulled off to give me a percentage reading on the brakes. The windshield wipers still did not work. The windshield washer still did not work.

. . . .

"Q. Continue, please. And while you're talking, I'm going to look to see if Perlite's here, but continue with your testimony. Keep talking.

"A.  Well, this vehicle was not brought up to standards.  I immediately went to Mr. Bosley's office.  He was gone for the day.  The following morning, I came in early to catch Mr. Bosley.  I got with Mr. Bosley the following morning.

"Q.  Well, just a moment.  Let the record show that we've called Perlite Mfg. Co. and they're still not present.  Continue, Mr. McLean.  You called him the following day, and what?

"A.  I came in the following day because when I had returned from the garage with the truck, Mr. Bosley had left the office for the day.  Immediately the following morning I came in and got Mr. Bosley.  I took him down to the vehicle and I showed him what had not been done on this vehicle.  He said to me, 'Take Mr. Young's truck again today.'  Well, he said to me, 'Drive it for one day and see what you say.'  I said, 'I can't drive it today, Mr. Bosley.'  It was raining out and there's no windshield wipers.  So they again used Mr. Young's truck for one day.  The following day he said, 'Please drive the truck for one day.'  It was nice weather, there was no rain.  I said 'I'll take it out.'  I said, 'It's against the law for me to take this vehicle on the road—there's no fire extinguisher, there's no flags and flares, there's no wipers, there's no windshield washers, I still didn't get a percentage reading on the brakes, the truck hasn't been serviced as it was supposed to be.'  He said, 'Will you please take it out for one day.'  I said, 'It's against the law for me to take it out.'  He said, 'Just take it for one trip and come back and maybe you'll have another report as to what you feel . . . else should be done to it.'  Okay, I said 'All right.'  I took the vehicle out on the road, but before I took the vehicle out on the road, I wrote out my road report of my I. C. C. regulations that specified right on there—that I was taking this truck out with all the

faults that was on the vehicle and I filed my report and I told Mr. Bosley I was doing it against my will but I needed a job. Let's face it—I have 5 children. So, I took it out. I took it up to Johnstown and Somerset and lost the brakes on it coming down the mountain.

. . . .

"Q. And these brakes failed?

"A. Yes, sir. They overheated on me and I was lucky at the bottom. I stayed off of them long enough that when I got to the bottom I got it geared down far enough and I got enough brakes out of them to get me stopped. I was very, very fortunate. I really was. Not only that, the vehicle had a very made [sic] carbon monoxide problem—it poured into the cab. I had no idea how it was getting into the cab—it's just that it was coming in. I had to ride with all my windows down and I was still becoming—ah—ill from the carbon monoxide fumes. So I got the truck back to Perlite and I parked it and I told Mr. Bosley right there that I would not drive this vehicle again.

. . . .

"Q. Continue, please. Continue, Mr. McLean.

"A. . . . So he said, 'Well, what if I take it back up to the garage and get this work done on it?' I said, 'Mr. Bosley, you've already paid for half of that work and it wasn't done.' I said, 'That garage is not competent and if you think I'm going to let you take the truck back to the same garage and expect me to drive it again,' I said, 'no, sir, no way am I driving that vehicle.' "

It seems to me that the claimant's testimony clearly demonstrates ample justification for his conduct. And, while it was within the Board's province to judge the claimant's credibility, I do not believe that his unrebutted testimony, even if not believed, provides substantial evidence to support a finding of willful mis-

conduct, especially when no evidence whatever has been offered at the hearing by the employer and the employer had the burden of proof. . I would reverse the order of the Board and grant benefits.